**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **Sarah Smiley** ) | |
| 6096 Cecils Chapel Road ) | |
| Hiwassee, Virginia 24347 ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No. _____** |
| ) | |
| **v.** ) | **Jury Demand** |
| ) | |
| **Winrock International Institute for** ) | |
| **Agricultural Development** ) | |
| 2121 Crystal Drive ) | |
| Suite 500 ) | |
| Arlington, Virginia 22202 ) | |
| ) | |
| **Serve:** ) | |
| **Rodney Ferguson** ) | |
| 2121 Crystal Drive, Suite 500 ) | |
| Arlington, Virginia 22202 ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT AND JURY DEMAND

### Preliminary Statement

1.     Plaintiff Sarah Smiley brings this action against her former employer, Winrock

International Institute for Agricultural Development ("Winrock") for declaratory relief and

compensatory damages in the form of backpay, front pay or reinstatement, emotional distress

damages, reputational damages, and attorney's fees and costs, under the anti-retaliation

provisions of Section 828 of the National Defense Authorization Act, 41 U.S.C. § 4712(a)

("NDAA"), and the False Claims Act, 31 U.S.C. § 3730(h) ("FCA").

2.     In 2015, Winrock entered into a Cooperative Agreement with the United States

Agency for International Development ("USAID") to implement USAID's Feed the Future

initiative in Southeast Asia through a project called Asia Innovative Farmers Activity ("AIFA").

3.      As a Regional Policy Manager for the AIFA Project, Ms. Smiley disclosed to Winrock management officials and to federal government employees who oversaw the Cooperative Agreement that Winrock engaged in fraud, gross mismanagement, and violations of law, rule, and regulation related to the award, by diverting USAID funds to develop a private, for-profit entity not authorized by the Cooperative Agreement, and by submitting false progress reports to USAID to obtain additional federal funding.

4.      In retaliation for Ms. Smiley's protected activity, Winrock terminated her employment.

## Jurisdiction and Venue

5.      Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 because Ms. Smiley's claims arise under the National Defense Authorization Act, 41 U.S.C. § 4712, and the False Claims Act, 31 U.S.C. § 3730(h), and present federal questions.

6.      Personal jurisdiction over Winrock in this Court is proper pursuant to Rule 4(k)(1)(a), Fed. R. Civ. P., because Va. Code § 8.01-328.1 authorizes personal jurisdiction over a person which transacts business in Virginia, causes tortious injury by an act or omission in Virginia, or causes tortious injury in Virginia by an act or omission outside Virginia.

7.      Winrock satisfies Va. Code § 8.01-328.1 because one of its headquarters is located in Arlington, Virginia, and as described herein, Winrock's actions and omissions inside and outside Virginia caused tortious injury to Ms. Smiley.

8.      Venue in this Court is proper under 28 U.S.C. § 1391(b)(1), because Winrock is the sole defendant in this action and maintains a headquarters in Arlington, Virginia, which is within the territorial bounds of the Eastern District of Virginia, Alexandria Division.

9.      28 U.S.C. § 2201(a) authorizes this Court to grant declaratory relief.

## Parties

10.     Plaintiff Sarah Smiley is a citizen of the United States and currently resides at 6096 Cecils Chapel Road, ~~Hiwasee~~Hiwassee, Virginia 24347.  Winrock employed Ms. Smiley from November 28, 2016 through December 29, 2017.

11.     Defendant Winrock International is a non-profit organization, located at 2121 Crystal Drive, Suite 500, Arlington, Virginia 22202.

## Factual Allegations

### Ms. Smiley's Background Made Her an Ideal Candidate for Winrock's Asian Agriculture Space.

12.     Ms. Smiley has an extensive background in international trade and economic development as well as first-hand experience promoting agricultural sustainability and growth.

13.     Ms. Smiley earned her Bachelor of Arts degree in Economics and Business Administration from Mary Baldwin University, and her Master of Business Administration in International Business from the University of Exeter in the United Kingdom.

14.     Following her graduation, in 1998, Ms. Smiley began working at the U.S. Department of Commerce's International Trade Administration, first as an International Trade Specialist, and subsequently as the Deputy Coordinator for Asia-Pacific Economic Cooperation Affairs for the Office of Asia-Pacific's Market Access and Compliance Program.

15.     Ms. Smiley also served as a Brookings Legislative Fellow in the Office of Senator Mike Crapo of Idaho.

16.     From 2006 to 2012, Ms. Smiley served as the Assistant Vice President of International Affairs in Europe for the Pharmaceutical Research and Manufacturers of America.

17.     Subsequently, she became the Associate Vice President (and later, President) of

Global Strategy and Analysis for the Advanced Medical Technology Association's European and Western Hemisphere sector.

18.     In these roles, Ms. Smiley developed strategic trade, market access, and economic development policy proposals on behalf of U.S. pharmaceutical and medical device manufacturers, and she advocated for the advancement of those policies before regulatory and governmental bodies in the U.S., the European Union, Mexico, and United Nations.

19.     Further, through her work with the Asia Pacific Economic Cooperation forum, she helped the U. S. Government develop positions and advance key policies with regulatory and governmental bodies within the twenty member countries.

20.     From 2012 through 2014, Ms. Smiley served as a Senior Advisor to the Asia Pacific Economic Cooperation ("APEC") in Singapore, a multimillion-dollar regional project funded by the U.S. Department of State USAID.  APEC sought to implement sustainable projects in the economies of its twenty-one member states.  Ms. Smiley designed projects and communication strategies to further this goal and expand members' economic development.

21.     More recently, from 2014 to through early 2017, Ms. Smiley served as the Chief Operating Officer of Smiley Farm in Virginia. In this capacity, she gained hands-on experience re-engineering and diversifying the Farm's product mix to ensure its agricultural sustainability. She also developed a line of organic products, which she sold across the U.S. and internationally.

22.     Ms. Smiley also founded the New River Valley Sheep and Goat Club, which promoted agricultural development in twelve economically distressed counties in Virginia. Under her leadership, the Club's membership grew from twenty farms in 2014 to more than 130 farms in 2017.

**Ms. Smiley Began Working on the Policy Component of the AIFA Project.**

23.     On November 28, 2016, Ms. Smiley began employment with Winrock, a non-profit organization that focuses on international development and economic and environmental sustainability.

24.     Winrock hired Ms. Smiley as the Regional Policy Manager for its Feed the Future Asia Innovative Farmers Activity ("AIFA" or "the Project") in Bangkok, Thailand.

25.     The AIFA Project sought to address global hunger and food security issues through supporting smallholder farmers in South and Southeast Asia by: (1) improving food security through the introduction of agricultural technologies, such as tools, equipment, and software, into the market, to make food production and distribution more efficient; and (2) transferring those technologies to countries in the targeted regions.

26.     To accomplish this mission, USAID and Winrock entered into a Cooperative Agreement on September 21, 2015 (No. AID-486-A-15-00005), through which USAID's Regional Development Mission for Asia provided federal funding to support AIFA. *See* CA No. AID-486-A-15-00005 (Sept. 18, 2015) (attached hereto as "Exhibit A"), Att. A, at 4.

27.     Attachment B to the Cooperative Agreement set forth a detailed Program Description of AIFA and the objectives for which USAID had authorized Winrock to spend the funding.

28.     The Cooperative Agreement obligated initial funding in the amount of $2,255,473.21 and stated, "Additional funds up to the total amount of the agreement shown in A.3.1 above [$14,884,061] may be obligated by USAID subject to the availability of funds, ***satisfactory progress of the project***, and continued relevance to USAID programs." Ex. A, Att. A, at 4 (emphasis added).

29.     Further, Sections A.5.2 and A.5.3 of the Cooperative Agreement required Winrock to submit Annual Work Plans and Monitoring and Evaluation ("M&E") reports to USAID to enable it to monitor Winrock's direction and progress on the Project.

30.     With respect to Annual Work Plans, USAID required Winrock to submit plans that outlined "overarching (performance management-based) intermediate results in connection with programmatic inputs (program interventions), outputs (process-based results such as model iterations developed), and outcomes (transformative results reflecting changes behaviors, policies and strategies informed) by Activity component." *Id.* at 5.

31.     With respect to the M&E reports, the Cooperative Agreement obligated Winrock to establish an M&E plan, approved by the Agent of Record ("AOR"), with quantifiable metrics—"indicators"—by which USAID could measure Winrock's progress on each Project component. *Id.* at 6-7.

32.     After Winrock developed an M&E plan, it submitted quarterly and annual M&E reports to USAID, in which it compared its actual performance to its targets.

33.     The M&E reports enabled USAID to determine whether Winrock was making "satisfactory progress [on] the project" under Section A.3.2 of the Cooperative Agreement, sufficient to trigger additional USAID funding.

34.     In November 2016, USAID approved a second modification to the Cooperative Agreement, which replaced the original Cooperative Agreement's program description with a new one.

35.     Nothing in the original or modified program description authorized Winrock to use AIFA funds to create a private, for-profit entity, or to use government funds to develop assets for a for-profit, privately controlled entity.

36.     Rather, the modified program description added a new policy component to the AIFA Project and increased the total estimated amount of the award by $4.8 million to provide for the associated costs.

37.     The new "Regional Agricultural Technology Policy" Component ("Policy Component" or "Component 3"), required Winrock to provide "policymakers, the private sector, and other stakeholders" with the "information, tools, opportunities, and incentives" to design and implement policies to further AIFA's mission. Modification No. 2, No. AID-486-A-15-00005 (Nov. 14, 2016) (attached hereto as "Exhibit B"), Att. B, at 7.

38.     Specifically, the Policy Component required AIFA to: "1) create a coalition of Policy Champions . . . to lead efforts to reform critical policies; 2) strengthen the capacity of regional policymakers through workshops, training, and experiential learning; and 3) generate and manage the evidence needed to support policy reform." *Id.*

39.     Winrock and USAID, acting through its AOR, Kipp Sutton, established the following M&E metrics, to evaluate the progress of the Policy Component on an annual basis:

| Indicator # | Indicator Name | Unit and Disaggregation | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Life of Project |
|---|---|---|---|---|---|---|---|---|
| Sub Intermediate Result 2.2: Laws, procedures and/or regulations addressing market barriers to agricultural technologies adopted and/or harmonized | | | | | | | | |
| 2.2.1 | Number of agricultural and nutritional enabling environment policies analyzed, consulted on, drafted or revised, approved and implemented with USG assistance | Number (total) | - | 3 | 3 | 2 | 2 | 10 |
| | | Approved or implemented | - | 0 | 1 | 1 | 2 | 4 |
| 2.2.2 | Number of policy forums and learning events conducted | Number | - | 4 | 9 | 9 | 9 | 31 |

Year 3 Annual Work Plan, Feed the Future Asia Innovative Farmers Activity 25 (Sept. 30, 2017).

7

40.     With respect to Indicator 2.2.1, the M&E Plan required that ten policies be "analyzed, consulted on, drafted or revised" over the life of the Project, with the following breakdown by each year:

- Year 1 (2016): 0;[1]
- Year 2 (2017): 3
- Year 3 (2018): 3
- Year 4 (2019): 2
- Year 5 (2020): 2

41.     Indicator 2.2.1 required that Winrock obtain approval of, or implement, four policies over the life of the Project, with the following annual requirements:

- Year 1 (2016): 0
- Year 2 (2017): 0
- Year 3 (2018): 1
- Year 4 (2019): 1
- Year 5 (2020): 2

42.     Indicator 2.2.2 required Winrock to conduct 31 "policy events and learning forums" over the life of the Project, with the following annual requirements:

- Year 1 (2016): 0
- Year 2 (2017): 4
- Year 3 (2018): 9
- Year 4 (2019): 9
- Year 5 (2020): 9

43.     In conjunction with the modification, Winrock hired Ms. Smiley as a Regional Policy Manager for the AIFA Project on November 28, 2016, to manage the newly added Policy Component of the Project.

44.     Ms. Smiley began working in Bangkok in January 2017.

---

[1] Winrock had nearly completed year 1 of the AIFA Project when USAID added the Policy Component in November 2016.

**William Sparks Directed the AIFA Team to Form WIN, a Private, For-Profit Entity, Using USAID Funds, to the Detriment of USAID's Intended Beneficiaries.**

45.     William Sparks joined Winrock as the Chief of Party for the AIFA Project—and became Ms. Smiley's direct supervisor—on September 11, 2017.

46.     Sparks immediately introduced his plan to launch and build the Winrock Innovation Network ("WIN"), a private, for-profit subsidiary of Winrock.

47.     From September 18 to 22, 2017, Winrock held meetings to develop AIFA's Year 2 Work Plan, which Ms. Smiley and the following individuals attended: Jeff Apigan (Winrock's Program Director), Ben Amick (the Project's Regional Innovations Director), Bandana Aryal (Senior Program Officer), Sam Bona (Country Director for Cambodia), Chanin Chiumkanokchai (Monitoring and Evaluation), Kim Fooyontphanich (Kasetsart University – innovation validation), Hoeung Hun (Senior Program Officer, Cambodia), Alex Loken (Winrock's Program Coordinator), Saifullah Abu Saleh Muhammad (Senior Program Officer, Bangladesh), Jenn Namjatturas (Social Media), Maksud Rahman (Country Director for Bangladesh), Amar Thing (Country Director for Nepal), and Tarinee Youkhaw (Communications).

48.     During these meetings, Sparks told Winrock's AIFA team that he planned to use USAID funds and the Winrock staff they supported to establish WIN—a private entity—and ensure WIN's financial viability for years beyond 2020, when USAID's federal support was anticipated to end.

49.     To that end, Sparks directed all members of the AIFA team to identify funding sources to "build the business."  Specifically, Sparks told country team members to make a WIN slide presentation to show to potential investors of WIN.

50.     Sparks' direction violated the Cooperative Agreement because it diverted federal funds away from the AIFA Project and to the establishment of an unauthorized private, for-profit

entity, outside the scope of the Cooperative Agreement.

51.     He also told the AIFA team that Winrock intended to establish a Board of
Advisors to set up WIN.  He assured the attendees that with the requisite investors, they would
establish WIN as a sustainable start-up company that would continue as the government funding
decreased or even stopped.

52.     During the meetings or shortly thereafter, Sparks shared a buy-in contract he
created for potential investors of WIN.  In exchange for minimum investments of $7 million,
investors would receive ownership rights in WIN.

53.     Sparks said that he sought to secure WIN's status as a "best-funded start up" and
urged the AIFA team to "build a business."  In other words, Sparks instructed the AIFA team
members, whose salaries USAID paid, to focus exclusively upon obtaining funding for WIN, to
the neglect of their duties under the Cooperative Agreement.

54.     Sparks directed Ms. Smiley to cease the work she was performing for the AIFA
Project and instead create a "Regulatory Scorecard" that rated agricultural regulations in Asian
countries.  Sparks planned to show this scorecard to potential WIN investors.  The scorecard
initiative jeopardized partnerships Winrock had previously developed based on technical
trainings and mutual support for policy changes, as well as key relationships with government
officials and stakeholders.  The scorecard was outside the scope of the AIFA Project described in
the Cooperative Agreement.

55.     In October 2017, Sparks instructed Ms. Smiley to draft job descriptions and job
advertisements for an Events Manager, Marketing Specialist, Youth Outreach Director, and
Innovations Sourcing Specialist at WIN.  Although Sparks planned to use USAID funding for
each of these positions, he made clear that the new employees would work to further WIN's

private interests, instead of those of AIFA, for which USAID provided funding.

56.     For example, USAID contracted with Winrock to obtain twelve new innovations from the field each year through the Innovation Challenge, a program through which third parties submitted agricultural innovations to Winrock, and Winrock submitted a subset of those ideas to its partners, including Kasetsart University and private companies in Bangkok, for technical validation.

57.     After the agricultural technologies were validated, Winrock agreed to develop and transfer them throughout Asia.

58.     Sparks stated that Winrock's innovation staff would obtain one hundred innovations through the program, but would keep any innovations acquired in excess of the first twelve for WIN's own use, even though they were obtained through the work of USAID-funded employees.  Sparks said that in return for the rights to the remaining eighty-eight innovations, WIN would provide their creators equity in the organization.

59.     Another example of Winrock's diversion of USAID funds to WIN involves Winrock's revocation of USAID funds to e-Fishery and EnerGaia, two private companies Winrock engaged to further support and develop the Innovation Challenge selectees' business models and help them expand into new, cross-border markets.

60.     In November 2017, after Winrock committed funds to the grantees, Sparks attempted to renege on Winrock's financial obligations to e-Fishery and EnerGaia in order to divert money to WIN, notwithstanding that USAID provided the money from which Winrock awarded the subgrants.  At Sparks' direction, Winrock suspended e-Fishery and EnerGaia's grants to save money for WIN.  When Winrock staff members and the companies objected, Sparks suggested that the grantees pay to have the funding returned, by providing WIN equity in

their companies.

61.     Ultimately, the grantees complained to USAID that Winrock improperly stopped their funding and Winrock was forced to cancel Sparks' suspensions of the grants.

62.     On November 10, 2017, Sparks organized a "communications planning meeting," purportedly to discuss how to improve communication between Winrock and its various stakeholders.  However, Sparks used the meeting to instruct Winrock employees on how to message WIN and find resources to support it.  During the meeting, he shared the pitch he developed with Winrock's field officers and instructed them to regurgitate it to potential investors.

63.     As of mid-to-late September 2017, Winrock employees assigned to the AIFA Project devoted a substantial portion of their work time, which USAID funded, to performing tasks for WIN.

64.     Winrock instructed its employees to record all of their work time on their timecards as time spent in furtherance of the AIFA Project, and Winrock submitted those timecards to USAID for payment.

65.     On December 20, 2017, Amick emailed Sparks and asked whether Winrock needed to submit a new or revised work plan to USAID given its "pivot to WIN."

66.     On December 22, 2017, Sparks responded that he was in the process of seeking USAID approval, *i.e.*, "writing a letter to USAID explaining what won't happen in our Y3 workplan due to budget uncertainty" and providing "a 'road map' of [Winrock's] way forward with a focus on sustainability (WiN) [*sic*] since we have only a year of funding left."

67.     Sparks' December 22, 2017 response made clear that he had not yet obtained USAID approval of WIN, despite the fact that he had begun to divert USAID funding to WIN

three months earlier.

**Ms. Smiley Immediately and Repeatedly Objected to Winrock's Fraudulent Misrepresentations and Gross Mismanagement of the USAID Agreement.**

68.     At the September 2017 meetings, Ms. Smiley publicly objected to Winrock's use of USAID funds to launch WIN.

69.     At the meeting, Winrock's Project Manager, Jeffrey Apigian, agreed with Ms. Smiley that Winrock's work on the WIN initiative possibly violated its agreement with USAID.

70.     During the same meeting, Ms. Smiley asked whether Winrock told USAID about, or USAID approved, the WIN concept, and Sparks said "no."

71.     Sparks told Ms. Smiley that Amanda Hilligas, Winrock's Senior Director of Agricultural & Enterprise, based at Winrock's Arlington, Virginia headquarters, supported WIN, but that Winrock had not yet informed USAID of its intention to build WIN using USAID funds.

72.     Ms. Smiley also asked if anyone had sought approval about the idea from Winrock's legal counsel, and Apigian said "no."

73.     Sparks stated that Winrock was restructuring to create WIN *first*, and then would inform USAID about what it had done.

74.     During the November 10, 2017 meeting, Ms. Smiley asked Sparks why any funds she raised for WIN would not constitute USAID funds, rather than WIN funds.  In response, Sparks placed his hands over his ears and told her she was "being so negative" about WIN.

75.     At least ten times from September 18, 2017 through early December 2017, Ms. Smiley reported to Sparks and other Winrock employees that it was illegal to establish WIN using USAID funds.  Among others, those employees included, among others, the following individuals: Jeff Apigan (Winrock's Program Director), Ben Amick (the Project's Regional Innovations Director), Sam Bona (Country Director for Cambodia), Amar Thing (Country

Director for Nepal), Maksud Rahman (Country Director for Bangladesh), Susan Ward (Chief of Party, USAID Asia CTIP Program), and Meghan Macbain (Chief of Party, USAID Thailand CTIP Program).

76.     Virtually everyone in the AIFA office knew of Ms. Smiley's reports, and many AIFA team members witnessed them.  Some employees even joined Ms. Smiley in her complaints.

77.     Following the September 2017 meetings at which Ms. Smiley protested Winrock's fraudulent use of USAID funds to establish WIN, Sparks prohibited her from communicating directly with USAID, even though Ms. Smiley's responsibilities included "coordinat[ing] closely with USAID/RDMA [Regional Development Mission for Asia] on policy related issues[.]" Ex. B, Att. B, at 14.

78.      Instead, Sparks mandated that both Ms. Smiley and USAID send all communications through him as "the buffer" and not communicate directly with one another.

79.     Sparks also excluded Ms. Smiley from AIFA's regular biweekly meetings with USAID.

80.     After Ms. Smiley continued to question whether USAID had approved WIN, Sparks told the AIFA team in or around October 2017, that USAID had, even though he knew his statement was false.

81.     On or around September 27, 2017, Ms. Smiley met privately with Sutham Phurahong Toh, the Project Management Specialist in USAID's Office of Economic Growth and Vulnerable Population.  Toh's responsibilities at USAID included overseeing the AIFA Project.

82.     During their meeting, Ms. Smiley told Toh that Sparks was directing the AIFA team to develop WIN, a private company, which Sparks referred to as a "best funded startup,"

using USAID funds.

83.     Ms. Smiley further told Toh that Sparks' actions disregarded USAID processes and procedures, and as a result, the AIFA Project required more USAID oversight.

84.     Ms. Smiley also told Toh that Sparks' plan to develop WIN was outside the scope of the Cooperative Agreement, had not been approved by USAID, and used USAID funds in a manner that was inconsistent with AIFA goals.

85.     Toh expressed concern, and he stated that he would investigate the matter.

86.     Three days later, on or about September 30, 2017, Winrock submitted its Annual Work Plan for Year 3 (October 1, 2017 through September 30, 2018) to USAID, which USAID subsequently approved.

87.     The Year 3 Annual Work Plan did not mention WIN or discuss Winrock's development of any private, for-profit entity using USAID funding.

88.     In fact, Winrock represented that it intended to use USAID funds only for the projects set forth in the Work Plan, even though Winrock knew these statements were false.

89.     In November 2017, Sparks emailed Toh and Kipp Sutton and reiterated that they should not correspond directly with Ms. Smiley.

**Winrock Made False Reports to USAID in its 2017 Annual Report.**

90.     In September 2017, the Bangkok AIFA team started to draft its Annual Report, which was due to USAID in mid-October 2017. Sparks began pressuring staff members to "start checking the USAID M&E boxes," whether or not they had completed the activities, so they could "focus on developing WIN."

91.     His direction to staff members amounted to falsification of Winrock status reports submitted to the U.S. government.

92.     Sparks told Ms. Smiley to check off all of the policy indicators for the Project immediately, but Ms. Smiley refused, because these statements would have been fraudulent. She explained that she needed to complete the indicators correctly.

93.     As of September or October 2017, Winrock had *not* completed all of the M&E indicators for the life of the Policy Component, which extended through 2020.

94.     In early October 2017, Sparks reiterated that Ms. Smiley needed to mark nearly *all* of the AIFA Project's policy indicators as complete in the 2017 Annual Report, for the entire life of the Project. Again, Ms. Smiley refused.

95.     In the ten days leading up to USAID's October 2017 deadline, Sparks went to Ms. Smiley's office nearly every day and insisted she falsify Winrock's performance on the Policy Component in the Annual Report, which was a status report to the U.S. government.

96.      Sparks said that he sought to complete "the basics" of the Project so that Winrock could "go big and bold," meaning that staff members could devote their efforts to WIN's development and not do USAID work any longer.

97.     Specifically, Policy Indicator 2.2.1 required Winrock to: (i) "analyze" three policies during year two of the Project; and (ii) implement or obtain approval of four of those policies during the life of the grant, with one approval or implementation in the second year of the grant, one in the third year, and two in the final year. Year 3 Annual Work Plan, Feed the Future Asia Innovative Farmers Activity 25 (Sept. 30, 2017).

98.     Under Policy Indicator 2.2.1, Ms. Smiley planned to report the three policies Winrock had "analyzed, consulted on, [or] drafted or revised":  (1) the International Standards for Phytosanitary Measures International Movement of Seeds, (2) Good Agriculture Practices, and (3) Public-Private Partnerships.

16

99.     However, Defendant, through Sparks, directed Ms. Smiley to misrepresent that Winrock had analyzed ten agricultural and nutritional enabling policies, instead of the three that it actually analyzed.  Sparks falsely told Ms. Smiley that "conversations" about policies constituted policy "analysis" for purposes of reporting progress in the Annual Report.

100.    Ms. Smiley objected and explained that mere conversations did not equate to policy analysis, and she said she would not make false representations in Winrock's status report to the U.S. government.

101.    She also discussed USAID's definition of policy analysis with other Winrock employees and external contacts whose projects required that they perform policy "analysis" for USAID.  All of her contacts confirmed that her understanding was correct.

102.    Sparks further directed Ms. Smiley to report falsely that one policy was "approved" under Indicator 2.1.1, when in reality only a fragment of the policy was approved.

103.    Policy Indicator 2.2.2 required Winrock to establish four policy forums and learning events during the first year of the Project and thirty-one over the life of the Project. *Id.*

104.    With respect to policy forums and learning events, the second modification of the Cooperative Agreement explained that AIFA would transmit information through:

> 1) workshops to set priorities, design, adopt, implement and evaluate policy options to enhance smallholder incomes and food security; 2) capacity building training to strengthen policymakers' ability to apply best practices in evidence-based policy making including policy analysis and strategy development, policy communication, policy implementation, and monitoring and evaluation; and 3) experiential learning events such as study tours and business-to-business exchanges to foster cross-border partnerships and collaboration.

Ex. B, Att. B, at 11.

105.    Ms. Smiley planned to report truthfully to the U.S. government that Winrock had held only five forums.

17

106.    However, Sparks directed Ms. Smiley to report basic interagency meetings in which a discussion "touched" upon a policy issue as a "policy forum" or "learning event" in Winrock's Annual Report.  Sparks directed Ms. Smiley to falsely report that twenty-five policy forums and learning events were held under this definition, versus the five that she intended to report truthfully.

107.    The policy forums defined by the modified Cooperative Agreement—workshops, capacity building training, and experiential learning events—do not encompass mere conversations which "touched" a policy issue.

108.    Ms. Smiley immediately objected to Sparks' mandate that she fraudulently report that Winrock completed twenty-five forums and learning events during the second year of the Project, when it had not.

109.    Despite Ms. Smiley's protests and explanation that Winrock could not substantiate Sparks' proposed numbers, if audited, Sparks continued to insist that Ms. Smiley report the fraudulent numbers he provided.

110.    Sparks falsely told Ms. Smiley that her refusal to check all the M&E boxes was "holding up the work" on the Policy Component.

111.    Sparks also assured Ms. Smiley that Winrock's headquarters would review the Policy Component of the Annual Report before its submission to USAID and would correct "any problems" with the information he insisted she include.

112.    Recognizing that she could not persuade Sparks to report the figures accurately, and acting on the belief that headquarters would force Sparks to correct the outlandish report, Ms. Smiley eventually agreed to the figures Sparks suggested in the face of the relentless pressure he exerted on her.

113.    About one month later, on November 16, 2017, Sparks obtained a meeting with Gloria Steele, USAID's Senior Deputy Assistant Administrator for Asia, for November 28, 2017 in Washington, D.C.

114.    Sparks told Ms. Smiley that he requested the meeting to "pitch" WIN to USAID and ensure that USAID released all available funds it contemplated for AIFA under the modified Cooperative Agreement.

115.    Before the meeting, Sparks internally circulated a memorandum which highlighted portions of Winrock's 2017 Annual Report, including the false statement that during the second year of the Project, Winrock "addressed" ten policies.

116.    On November 27, 2017, Ms. Smiley emailed Sparks to reiterate that the statements were inaccurate.  She feared that Sparks would leverage this and other false statements during his meeting with Ms. Steele to obtain more funding and misrepresent Winrock. Ms. Smiley repeated that Winrock could not substantiate the statement, and it would cause Winrock to lose credibility with USAID, should USAID investigate the false claim.

**Winrock Decided to Terminate Ms. Smiley in Retaliation for Her Reports and Then Concocted a Pretextual, Post-Hoc Justification.**

117.    On September 20, 2017, two days after Plaintiff first objected to WIN, Sparks decided to terminate her employment, in retaliation for her protected activity.

118.    At the time he decided to fire her, he had no legitimate basis for his decision, but he concocted a purported, pre-textual justification months later, on November 8, 2017.

119.    Indeed, on September 20, 2017, when Winrock decided to terminate Ms. Smiley, Jennifer Snow, Associate Director of Winrock's Agriculture & Volunteer Programs, emailed Sparks and Jeffrey Apigian and directed them to provide a post hoc justification:

> We can either present this as a termination due to poor performance or

termination of the position given the proposed change to the policy component (and resulting change in what we need for that role). Since we don't have USAID approval for the policy component change, not sure if we want to go that route.

120.    In the same email, Snow also asked Apigian to gather any documents related to Ms. Smiley's "performance in the past" and to document any such issues, if he had not already done so.

121.    The next day, on September 21, 2017, Hilligas, Winrock's Senior Director of Agricultural & Enterprise, forwarded Snow an email chain between Ms. Smiley and another Winrock employee, dated between May and June 2017, in which Ms. Smiley criticized Winrock's former Chief of Party.  Hilligas admitted that Winrock was not terminating Ms. Smiley "for cause," but said she found the exchange "unprofessional."

122.    That same day, on September 21, 2017, Apigian replied that he and Sparks "tentatively decided" to "frame[ ]" Ms. Smiley's termination "as stemming from a pivot in our approach" and stated that he would prepare a justification based on that purported basis.

123.    After significant internal debate on the justification for Ms. Smiley's termination, which was clearly in retaliation for her protected activity, on October 7, 2017, Sparks sent a memorandum to Hilligas and Apigian, in which he asked disingenuously, "Is Sarah Smiley meeting performance expectations under Component 3 [the Policy Component] of AIFA?"

124.    The memorandum showed that the purported basis for Ms. Smiley's termination was pretextual because it fabricated an alleged performance issue as the basis for her termination.

125.    The memorandum falsely stated that "Sarah has not brought the Component 3 work far enough in the time she has had nor do I [Sparks] have confidence that she has the drive or vision to push the AIFA Component 3 agenda forward[.]"  Sparks further falsely stated that he

believed "a change (specifically, Sarah's removal) is required to achieve the activities of

Component 3[.]"

126.    In this memorandum, Sparks also detailed his plan to "hire[ ] a component 3

employee" to replace Ms. Smiley on or before her termination at the end of December 2017.

127.    In follow up to Sparks' memorandum, on October 25, 2017, Snow cautioned that

Winrock could not substantiate the grounds of a performance-based termination:

> This to me shows more of an elimination of Sarah due to poor performance rather
> than because of a reworked Policy component and there no longer being a need
> for the position. . . . If we are terminating Sarah due to poor performance, HR will
> want to see that there is evidence of when Sarah was given clear parameters for
> improvement and then not come through.

128.    Later that day, Sparks admitted that the reasons given for Ms. Smiley's

termination were all pretextual:

> This document was intended as an internal, internal [sic] document so as to
> document all of the considerations moving forward and to show our due diligence
> in making a difficult decision.  Jeff had written up 4-5 bullet points that justified
> the change by way of the project pivot into a new direction.  These are the official
> reasons we should use.

129.    On November 7, 2017, Apigian emailed Snow, Hilligas, Regina Rice, Human

Resources Manager, and DeAnn McGrew, Winrock's Director of Agriculture & Volunteer

Programs, and stated yet another reason for her termination—Winrock was eliminating her

position.

130.    On November 8, 2017, Apigian emailed the group a written justification for Ms.

Smiley's termination, based on the purported elimination of her position, which stated,

"USAID/RDMA is currently undergoing budgetary cuts and future funding for the AIFA project

is uncertain[.]"

131.    On December 4, 2017, the very first day that Sparks returned to Bangkok from his

meeting with USAID in Washington, D.C., he terminated Ms. Smiley's employment, effective December 31, 2017.

132.   Sparks falsely stated that he eliminated Ms. Smiley's position because of the decided-upon pre-textual reasons that her salary was "too expensive" due to "budget cuts."

133.   Sparks stated this, despite having directed Winrock staff to spend their time pursuing potential investors for WIN, developing WIN's pitch, and drafting WIN-related materials such as the regulatory scorecard and WIN position descriptions, instead of pursuing the USAID objectives contemplated by the Cooperative Agreement and its modifications.

134.   Sparks told Ms. Smiley that "anyone could do policy" and that he would simply hire a policy group to "check the boxes for USAID."  This statement aligned with Sparks' assertion in his October 7, 2017 memorandum that he planned to "replace Sarah," despite Winrock's purported elimination of her position, and his intent to "check the boxes" without doing the required work.

135.   Although USAID told Sparks he could not terminate Ms. Smiley until he provided a plan which outlined how Winrock would satisfy the Policy Component in Ms. Smiley's absence—and USAID approved that plan—upon information and belief, Sparks never provided such a proposal.

136.   Rather than explain how Winrock would fulfill the Policy Component without Ms. Smiley, Winrock falsely represented that it substantially completed the Policy Component, and therefore, did not require a Regional Policy Manager, even though it planned to replace her.

137.   Winrock's Thailand Employee Handbook required Winrock to provide a severance payment to any employee the Company terminated pursuant to a reduction in force ("RIF").

138.    Although Winrock falsely claimed that it terminated Ms. Smiley's employment due to a purported downsizing, it refused to provide Ms. Smiley a severance payment under its handbook, because it had not actually terminated her due a RIF.[2]

139.    Upon information and belief, after Ms. Smiley's counsel contacted Winrock and articulated her legal claims against it, Winrock submitted a revised Year 3 Work Plan to USAID, which added information about WIN, and thereby conceded that WIN was not within the scope of the work plan it previously submitted on September 30, 2017.

**Ms. Smiley Exhausted Her Administrative Remedies.**

140.    On February 28, 2018, Ms. Smiley filed a complaint with USAID's Office of Inspector General ("OIG"), based on Winrock's termination of her employment in retaliation for her repeated reports of Winrock's fraud, gross mismanagement, and violations of law, rule, and regulation related to the AIFA Project and USAID grant.

141.    OIG completed its investigation on December 20, 2018, and in a March 8, 2019 report to Mark Green, USAID Administrator, determined that "[e]vidence including numerous witness statements and email conversations OIG reviewed established a timeline of events consistent with Sarah Smiley's allegations that Winrock managers and its chief of party, Sparks, retaliated against her for raising issues of possible misuse of USAID funds to Winrock managers."  U.S. Agency for Int'l Development, Office of Inspector General, Report of Investigation, LA-H0-18-0335-I, at 3 (Mar. 8, 2019).

142.    On March 15, 2019, Administrator Green issued a two-sentence order in which he denied Ms. Smiley relief.  Order, Decision Under 41 U.S.C. § 4712 on 010 Referral LA-H0-18-

---

[2] Winrock belatedly provided Ms. Smiley these funds only after Ms. Smiley retained legal counsel who pointed out the internal inconsistency of Winrock's refusal to pay Ms. Smiley severance.

0335-I (Mar. 15, 2019).

143.    41 U.S.C. § 4712 authorizes Ms. Smiley to bring a *de novo* action against Winrock in federal district court.

144.    After USAID's Administrator rejected OIG's conclusion, USAID awarded additional funds to Winrock's Counter-Trafficking In Persons ("CTIP") Project, an area in which Winrock previously had limited experience working with USAID.

**COUNT I**
**RETALIATION IN VIOLATION OF**
**THE NATIONAL DEFENSE AUTHORIZATION ACT, 41 U.S.C. § 4712,**
**AGAINST DEFENDANT**
**WINROCK INTERNATIONAL INSTITUTE FOR AGRICULTURAL DEVELOPMENT**

145.    Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1 to 144 above, as though reinstated herein.

146.    Section 828 of the National Defense Authorization Act ("NDAA") prohibits a federal grantee from retaliating against an employee on the basis of her protected activity, including her reports that her employer engaged in fraud, gross mismanagement, or violations of law, rule, and regulation with respect to a federal award.

147.    Ms. Smiley worked as Winrock's Regional Policy Manager for the AIFA Project from November 28, 2016, until December 2017.

148.    Winrock engaged in fraud, gross mismanagement, and violations of law, rule, and regulation under the Cooperative Agreement when it diverted federal funds awarded to the AIFA Project to develop a private, for-profit entity, WIN, in violation of federal law.

149.    Federal regulation requires a non-federal entity which receives a federal award to provide for "[e]ffective control over, and accountability for, all funds, property, and other assets." 2 C.F.R. § 200.302(b)(4).

150.    Further, a non-federal award recipient "must adequately safeguard all assets and assure that they are used *solely* for authorized purposes." *Id.* (emphasis added).

151.    Neither the Cooperative Agreement nor any modification thereto authorized Winrock to use federal funds to develop WIN, a private, for-profit entity, or assign innovations developed for AIFA to WIN, so that it could profit from them.

152.    Additionally, grant recipients must "report deviations from . . . project scope or objective, and request *prior approvals* from Federal awarding agencies for . . . program plan revisions" under federal regulation.  2 C.F.R. § 200.308(b) (emphasis added); *see also id.* § 200.308(c) (requiring recipients to receive prior approval for a "[c]hange in the scope or objective of the project or program (even if there is no associated budget revision requiring written approval)").

153.    Winrock did not request approval from USAID before changing the scope of the Cooperative Agreement or diverting USAID funds to establish WIN.  Rather, Winrock sought approval from USAID only after it had implemented such changes and Ms. Smiley expressed her intent to notify USAID of Winrock's unlawful conduct.

154.    Ms. Smiley reasonably believed, and was correct, that Winrock's use of USAID funds to establish WIN, without USAID's approval, constituted fraud and gross mismanagement of the USAID grant, and violated U.S. rules and regulations pertaining to the management of grants.

155.    Ms. Smiley protested Winrock's diversion of USAID funds to WIN, including: (1) on September 18, 2017, when she publicly objected to Sparks about Winrock's use of USAID funds to launch WIN without USAID's knowledge or approval; (2) on September 27, 2017, when she told Sutham Phurahong Toh that Sparks directed the AIFA team to use USAID

funds to develop WIN; (3) on November 10, 2017, when she publicly told Sparks that any funds she raised while working on the AIFA Project constituted USAID funds, rather than WIN funds; and (4) on at least eight other occasions between September 2017 and December 2017, when Ms. Smiley reported to Sparks and other Winrock employees that it was illegal to establish WIN using USAID funds.

156.    Winrock engaged in fraud, gross mismanagement, and violations of law, rule, and regulation when it submitted false reports to USAID about the Policy Component's progress in its October 2017 Annual Report, in order to obtain additional federal funding.

157.    A federal award recipient must submit annual performance reports to an awarding agency, and such reports must contain "[a] comparison of actual accomplishments to the objectives of the Federal award established for the period."  2 C.F.R. § 200.328(b)(1).

158.    Winrock violated federal regulations because, in its 2017 Annual Report, it did not report its "actual accomplishments" with respect to the Policy Component.  Rather, Winrock falsely represented that it accomplished far more than it actually had, in order to secure additional funding from USAID.

159.    Ms. Smiley reasonably believed, and was correct, that Winrock's false report to USAID, in order to receive additional, performance-based federal funding, constituted fraud and gross mismanagement of the USAID award, and violated U.S. rules and regulations.

160.    Ms. Smiley repeatedly protested Winrock's misrepresentations in its October 2017 Annual Report, including when: (1) in the ten days before the deadline for Winrock's Annual Report, she repeatedly protested Sparks' directives to falsely report that Winrock "analyzed" ten agricultural and nutritional enabling policies, obtained "approval" of one policy, and held twenty-five policy forums and learning events; and (2) on November 16, 2017, Ms.

Smiley again reported to Sparks that Winrock misrepresented that it had "addressed" ten policies.

161.     In reprisal for Ms. Smiley's protected conduct, Winrock terminated her employment on December 4, 2017.

162.     Although Winrock made the decision to terminate Ms. Smiley's employment on September 20, 2017, two days after she first objected to WIN, Winrock had no legal basis to do so, and could not decide on a pre-textual basis for its decision until nearly two months later, on November 8, 2017.

163.     Winrock's claim that it eliminated Ms. Smiley's position is demonstrably false, because as Sparks stated in his October 7, 2017 memorandum, at the time he decided to terminate her, he planned to "replace Sarah[.]"

164.     The real reason for Ms. Smiley's termination was retaliation for her protected conduct, described in paragraphs 155 and 160 above.

165.     As a result of Winrock's retaliation, Ms. Smiley has suffered, and will continue to suffer, past and future economic losses, lost benefits, damage to her professional reputation, emotional distress, and pain and suffering.

**COUNT II**
**RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT'S**
**ANTI-RETALIATION PROVISION, 31 U.S.C. § 3730(h)(1),**
**AGAINST DEFENDANT**
**WINROCK INTERNATIONAL INSTITUTE FOR AGRICULTURAL DEVELOPMENT**

166.     Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1 to 165 above, as though reinstated herein.

167.     The False Claims Act's anti-retaliation provision prohibits an employer from discriminating against an employee because of her lawful efforts to stop the employer's violation

of the False Claims Act.  31 U.S.C. § 3730(h)(1).

168.    When Winrock deliberately misrepresented its progress to USAID in its October 2017 Annual Report, for the purpose of obtaining additional, performance-based funding from USAID, Winrock impliedly and falsely certified its compliance with the conditions of USAID's payments to Winrock, including that it had accomplished the progress it reported.

169.    Ms. Smiley reasonably believed, and was correct, that those certifications were false because Winrock intentionally misrepresented its progress on the M&E metrics for the Policy Component, for the purpose of obtaining additional funding from USAID.

170.    Ms. Smiley engaged in protected activity in furtherance of her efforts to stop Winrock from misrepresenting its progress in the October 2017 Annual Report, in order to obtain more funding, when: (1) in the ten days leading up to the deadline for Winrock's October 2017 Annual Report, she repeatedly protested Sparks' directives to falsely report that Winrock "analyzed" ten agricultural and nutritional enabling policies, obtained "approval" of one policy, and held twenty-five policy forums and learning events; and (2) on November 16, 2017, she reported to Sparks that Winrock misrepresented that it had "addressed" ten policies.

171.    Further, when Winrock directed its employees on the AIFA Project to spend their time developing WIN—a private, for-private entity—rather than performing their duties under the Cooperative Agreement, but continued to submit their employees' timecards to USAID for payment, Winrock knowingly charged USAID payments to which it was not entitled.

172.    Ms. Smiley reasonably believed, and was correct, that Winrock committed timecard fraud by requesting and receiving USAID payments for the time its employees spent developing WIN, a for-profit entity that Winrock sought to develop solely for private gain.

173.    Ms. Smiley engaged in protected activity in furtherance of her efforts to stop

Winrock's False Claims Act violations when: (1) on September 18, 2017, she publicly objected to Sparks about Winrock's use of USAID funds to launch WIN without USAID's knowledge or approval; (2) on September 27, 2017, she told Sutham Phurahong Toh that Sparks directed the AIFA team to use USAID funds to develop WIN; (3) on November 10, 2017, she publicly told Sparks that any funds she raised while working on the AIFA Project constituted USAID funds, rather than WIN funds; and (4) on at least eight other occasions between September 2017 and December 2017, Ms. Smiley reported to Sparks and other Winrock employees that it was illegal to establish WIN using USAID funds.

174.    In reprisal for Ms. Smiley's protected conduct, Winrock terminated her employment on December 4, 2017.

175.    Although Winrock made the decision to terminate Ms. Smiley's employment on September 20, 2017, two days after she first objected to WIN, Winrock had no legal basis to do so and could not decide on a pre-textual basis for its decision until nearly two months later, on November 8, 2017.

176.    Winrock's claim that it eliminated Ms. Smiley's position is demonstrably false, because as Sparks stated in his October 7, 2017 memorandum, at the time he decided to terminate her, he planned to "replace Sarah[.]"

177.    The real reason for Ms. Smiley's termination was retaliation for her protected conduct, described in paragraphs 170 and 173 above.

178.    As a result of Winrocks' retaliation, Ms. Smiley has suffered, and will continue to suffer, past and future economic losses, lost benefits, damage to her professional reputation, emotional distress, and pain and suffering.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court grant her the following relief:

1.      Award Plaintiff two times her back pay, and interest on the back pay;

2.      Award Plaintiff front pay, or alternatively, reinstate her to her former position at Winrock, with the same seniority status;

3.      Award Plaintiff other compensatory and consequential damages against Winrock, including compensation for her reputational and emotional injuries;

4.      Award Plaintiff the attorney's fees and the costs she has incurred in bringing this action;

5.      Issue a declaratory judgment that Winrock retaliated against Plaintiff on the basis of her protected activity and in violation of the NDAA and FCA; and

6.      Grant such other relief as this Court deems just and necessary.

Respectfully submitted,

*Alan R. Kabat*

Alan R. Kabat, Esquire (VSB 76898)
BERNABEI & KABAT, PLLC
1400 16th Street, N.W., Suite 500
Washington, D.C. 20036-2223
Tel. (202) 745-1942
Fax (202) 745-2627
Email: Kabat@bernabeipllc.com
*Counsel for Plaintiff Sarah Smiley*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **Sarah Smiley**<br>6096 Cecils Chapel Road<br>Hiwassee, Virginia 24347<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>**Winrock International Institute for**<br>**Agricultural Development**<br>2121 Crystal Drive<br>Suite 500<br>Arlington, Virginia 22202<br><br>**Serve:**<br>**Rodney Ferguson**<br>2121 Crystal Drive, Suite 500<br>Arlington, Virginia 22202<br><br>      **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Civil Action No.** _____<br><br>    **Jury Demand** |

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

*Alan R. Kabat*

Alan R. Kabat, Esquire (VSB 76898)
BERNABEI & KABAT, PLLC
1400 16th Street, N.W., Suite 500
Washington, D.C. 20036-2223
Tel. (202) 745-1942
Fax (202) 745-2627
Email: Kabat@bernabeipllc.com
*Counsel for Plaintiff Sarah Smiley*